IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARTY NORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:16CV1388 |
| | ) | |
| CALL-A-NURSE, LLC; NOVANT | ) | |
| HEALTH TRIAD REGION, LLC; AND | ) | |
| THE MOSES H. CONE HOSPITAL | ) | |
| OPERATING CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff initiated this action alleging that Defendants unlawfully terminated her employment in violation of the Age Discrimination in Employment Act ("ADEA" or the "Act"), 29 U.S.C. § 623, and the public policy of North Carolina, specifically N.C. Gen. Stat. § 143-422.2. (ECF No. 1 ¶¶ 25, 29.) Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 35.) For the reasons outlined below, Defendants' motion will be granted.

As background, in 1994, Plaintiff established, and was the sole owner of, a call–in nursing service called Call a Nurse, P.C. (ECF No. 35-3 at 13.) In 1996, Call a Nurse, P.C. was purchased by Triad Health Ventures, Inc.[1] ("Triad Ventures") for $360,000. (*Id.* at 21–

---

[1] Plaintiff alleges that Defendants, Novant Triad Region, LLC and The Moses H. Cone Hospital Corporation were the controlling owners and directors of Triad Ventures. (ECF No. 1 ¶ 12.)

22.) Contemporaneously with the purchase of the business, on June 28, 1996, Triad Ventures entered into an Executive Employment Agreement with Plaintiff in which she agreed to serve as Executive Director of the business. (*Id.* at 15–16, 42.) Triad Ventures later conveyed its assets to Call-A-Nurse, LLC ("CAN"), a limited liability company owned by Defendants, Novant Health and Moses Cone. (*See* ECF No. 35-8 at 4; ECF No. 42-5 at 7.) At that time, Plaintiff became an employee of CAN, and continued to serve as its Executive Director until she was terminated, effective June 27, 2015. (*See* ECF No. 1 ¶¶ 18–19; ECF No. 35-3 at 16.) Plaintiff was 57 years of age at the time of her termination. (ECF No. 42-1 ¶ 1.)

Defendants now move for summary judgment on each of Plaintiff's unlawful termination claims based on age, contending that there is no genuine issue of material fact related to either claim and that Defendants are entitled to judgment as a matter of law. (ECF No. 35.)

## I. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)). The role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

In opposing a properly supported motion for summary judgment, the nonmoving party cannot rest on "mere allegations or denials," *id.* at 248, and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must support its assertions by citing to particular parts of the record or showing that materials cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56 (c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

## II. DISCUSSION

### A. Plaintiff's ADEA Claim

The Act makes it unlawful for an employer to discharge an individual based on age. 29 U.S.C. § 623(a)(1). The Act specifically prohibits discrimination of employees and applicants based on age for individuals aged 40 and above. *Id.* § 631(a). The burden of proving that age was a determining factor in an employment decision is on the plaintiff. *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004). A plaintiff can establish her claim of discrimination through direct or circumstantial evidence that age bias motivated the employment decision, or by relying on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *Mereish*, 359 F.3d at 334. Under the *McDonnell Douglas* framework,

3

a plaintiff "must first establish a prima facie case of discrimination by a preponderance of the evidence." *Id.*; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). To establish a prima facie case of age discrimination, a plaintiff must show: (1) that she was a member of the protected class; (2) that she was qualified for the job; (3) that she suffered an adverse employment action, and (4) that following discharge she was replaced by a substantially younger person with comparable qualifications. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). If Plaintiff succeeds in establishing a prima facie case of her claim, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000). If the defendant satisfies this burden, the presumption of discrimination created by the prima facie case disappears and the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered justification is pretextual. *See Mereish*, 359 F.3d at 334.

In this case, Defendants deny that they discriminated against Plaintiff but stipulate, for the purposes of this motion, that Plaintiff can satisfy her initial burden, under the *McDonnell Douglas* framework, of establishing a prima facie case of discrimination based on age. (ECF No. 36 at 1–2.) Defendants argue, however, that they have a legitimate business reason for terminating Plaintiff. (*Id.*) Specifically, they contend "that the decision [to terminate Plaintiff] was a direct result of [Novant Health's] plan to cease operations of [a] flawed call center[,] [CAN,] and to create an internal consumer engagement center with improved efficiencies and expanded services and capabilities." *Id.* Further, Defendants argue that Plaintiff is unable to show that their business reason is a pretext for discrimination. *Id.* at 2.

4

Plaintiff responds that because "[t]he undisputed evidence establishes [her] prima facie case [of age discrimination,] . . . [she] has focused her argument primarily on pretext." (ECF No. 43 at 12.) According to Plaintiff, "[D]efendants justify their actions through a detailed account of the planning and implementation of a new call center, allegedly to replace CAN." (*Id.* at 1.) Plaintiff argues that "[t]he arguments surrounding the new call center are a *red herring*, intended to distract from the reality that [D]efendants terminated [Plaintiff] on June 1, 2015, a full year prior to the call center fully replacing CAN." (*Id.*)

Because the parties do not dispute that Plaintiff can meet the initial burden of establishing a prima facie case of discrimination based on age, (ECF No. 36 at 2; ECF No. 43 at 12), the burden of production shifts to Defendant to articulate a legitimate nondiscriminatory business reason for terminating Plaintiff, *Stokes*, 206 F.3d at 429. Defendants produced evidence showing the following: In 2013, Defendant Novant Health Triad Region, LLC ("Novant Health") hired a Senior Vice President of Marketing and Communication, David Duvall ("Duvall"). (ECF No. 35-1 ¶ 3.) Duvall was charged with managing the Novant Health brand and brand assets, guiding the public relations team, leading communications to the nearly 26,000 Novant team members, and developing advertising campaigns and consumer engagement programs. (ECF No. 35-4 at 4.) Once hired, Duvall began conducting interviews to learn more about the organization and find ways to improve the Novant Health brand. (ECF No. 35-1 ¶ 4; ECF No. 35-4 at 6.) Through these interviews Duvall became aware of serious concerns with CAN, ranging from poor service and excessive dropped calls to the absence of performance metrics. (ECF No. 35-4 at 6–9.) In response, Duvall hired an outside consultant to evaluate CAN and its management. (ECF No. 35-1 ¶ 6;

5

ECF No. 35-4 at 10.) On or about June 9, 2014, the consultant issued a report that concluded, among other things: that CAN was "[n]ot an efficient operation" and failed to engage in "data driven decision-making"; that Plaintiff as its Executive Director was "neither technologically savvy nor business strategy savvy"; and that "CAN ha[d] grown beyond the capability of the current management." (ECF No. 35-3 at 59, 68, 84.) The report further concluded that Defendant Novant Health should either sell CAN and create a new internal Novant Health contact center or have Novant Health acquire CAN and install a Novant Health employee to lead CAN's operations. (ECF No. 35-3 at 86–87.) As a result, Novant Health made the decision to create a new internal Novant Health consumer engagement center ("CEC"). (ECF No. 35-1 ¶ 8.) A leadership team was put in place to develop a proposal for the CEC. (*Id.* ¶ 10.) On October 3, 2014, the leadership team recommended that Novant Health hire new leadership for CAN during the transition. (*See id.* at 3, 68.) In addition to the deficiencies outlined in the consultant's report, there was specific concern from the board's perspective "that Plaintiff, who regarded CAN as her 'baby' would not be amenable to the organizational changes underway." (ECF No. 36 at 21; *see* ECF No. 35-3 at 14; ECF No. 35-7 at 5–6.) On June 1, 2015, Plaintiff was terminated. (ECF No. 42-1 ¶ 31.) On that same day, three other management level employees of CAN, some over age 40 and some under age 40, were also terminated. (*See* ECF No. 35-8 at 4; ECF No. 35-10 at 11.)

Defendants have produced substantial evidence supporting their business decision to replace CAN with a multifaceted CEC, and further, to terminate certain members of CAN's current management, including Plaintiff, during the transition. *(See, e.g.,* ECF No. 35-3 at 53– 88) Though Plaintiff has described Defendants detailed discussion of the planning and

6

implementation surrounding the new call center as a "red herring" to distract from her firing, (ECF No. 43 at 1), this Court disagrees with that characterization. Rather, the evidence submitted by Defendants, as well as their detailed discussion of the evidence, provides background and context for their business decision to terminate Plaintiff's employment. "To meet [its] production burden under the *McDonnell Douglas* framework, [Defendants are] not required to persuade [the Court] that the proffered reason was the actual motivation for [its] decision. . . . [They] must merely articulate a justification that is 'legally sufficient to justify a judgment' in [their] favor." *Mereish*, 359 F.3d at 335 (quoting *Burdine*, 450 U.S. at 255). The Fourth Circuit has found that such a strategic decision constitutes a legally sufficient justification for a plaintiff's termination. *See id.* at 335–336 ("Without the ability to update the skills of their employees to meet the shifting demands of technology and society, business could not thrive. . . . [T]he ADEA was not intended to obstruct the ability of a commercial enterprise to making necessary adjustments in the face of economic challenges. . . . Neither was it designed to prevent leaders . . . from achieving the mix of employee expertise that will best fulfill [a business's] goals." (internal quotation marks and citation omitted)). The Court concludes that Defendants have met their burden of production by articulating and providing evidentiary support for a legitimate nondiscriminatory reason for their decision to terminate Plaintiff. Thus, the presumption derived from Plaintiff having established a prima facie case disappears from the case and the burden now shifts to Plaintiff to establish pretext. *See id.* at 334.

"Once the question comes down to pretext, a plaintiff 'must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered

implementation surrounding the new call center as a "red herring" to distract from her firing, (ECF No. 43 at 1), this Court disagrees with that characterization. Rather, the evidence submitted by Defendants, as well as their detailed discussion of the evidence, provides background and context for their business decision to terminate Plaintiff's employment. "To meet [its] production burden under the *McDonnell Douglas* framework, [Defendants are] not required to persuade [the Court] that the proffered reason was the actual motivation for [its] decision. . . . [They] must merely articulate a justification that is 'legally sufficient to justify a judgment' in [their] favor." *Mereish*, 359 F.3d at 335 (quoting *Burdine*, 450 U.S. at 255). The Fourth Circuit has found that such a strategic decision constitutes a legally sufficient justification for a plaintiff's termination. *See id.* at 335–336 ("Without the ability to update the skills of their employees to meet the shifting demands of technology and society, business could not thrive. . . . [T]he ADEA was not intended to obstruct the ability of a commercial enterprise to making necessary adjustments in the face of economic challenges. . . . Neither was it designed to prevent leaders . . . from achieving the mix of employee expertise that will best fulfill [a business's] goals." (internal quotation marks and citation omitted)). The Court concludes that Defendants have met their burden of production by articulating and providing evidentiary support for a legitimate nondiscriminatory reason for their decision to terminate Plaintiff. Thus, the presumption derived from Plaintiff having established a prima facie case disappears from the case and the burden now shifts to Plaintiff to establish pretext. *See id.* at 334.

"Once the question comes down to pretext, a plaintiff 'must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered

by the defendant were not its true reasons, but were a pretext for discrimination.'" *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 143 (2000)). A plaintiff can prove pretext by showing that the alleged nondiscriminatory explanation is "unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of age discrimination." *Mereish*, 359 F.3d at 336 (internal quotation marks omitted). However, a plaintiff may not "simply show that the articulated reason is false; [s]he must also show that the employer discriminated against [her] on the basis of age." *Laber v. Harvey*, 438 F.3d 404, 430–31 (4th Cir. 2006). At this stage, Plaintiff's burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (alteration in original) (quoting *Burdine*, 450 U.S. at 256).

Here, to avoid judgment as a matter of law on her ADEA claim, Plaintiff must establish a legally sufficient evidentiary basis for a reasonable jury to find that Defendants' proffered reason for her termination was pretextual. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278–79 (4th Cir. 2000). However, Plaintiff's brief, affidavits, and arguments related to pretext focus primarily on countering Defendants' assessment of Plaintiff's performance as executive director of CAN and the performance of CAN under her leadership, with her own assessment of both. (*See* ECF No. 43 at 13–16.) This approach is misguided. The Fourth Circuit has held that Plaintiff cannot establish discrimination by disagreeing with her employer's assessment of her work performance, and in this case the performance of CAN, since in a wrongful discharge action only the perception of the employer matters, not a self-assessment

8

by Plaintiff. *See Hawkins*, 203 F.3d at 280; *Howard v. Coll. of the Albemarle*, 262 F. Supp. 3d 322, 333 (E.D.N.C. 2017) ("Although [Plaintiff] contests the factual accuracy of the critiques of his performance, . . . the accuracy of those critiques is irrelevant to the [C]ourt's inquiry. Rather, the issue is whether the . . . decisionmaker[ ] believed the critiques to be true."), *aff'd*, 697 F. App'x 257 (4th Cir. 2017). Further, assuming Plaintiff's effort is to show that Defendants' articulated reason for termination is false, to establish her claim of pretext, Plaintiff must still present evidence that the real reason for her termination was age discrimination. *Laber*, 438 F.3d at 430–31. Plaintiff has failed to do so here. When asked in her deposition to provide the basis for her claim that her termination was based on age and not a legitimate business reason, Plaintiff stated:

> A. . . . Because no one came to me and said, "[y]ou are not performing in the manner that you need to be performing. You are lacking in job performance. You are not operating this company in the way it needs to be operated." I have to assume it was my age.
>
> Q. . . . So, it's just an assumption?
>
> A. What else was it? I'm not sure what else it would have been.

(ECF No. 35-3 at 11–12.)

In addition to Plaintiff's acknowledgment that the basis for her age discrimination claim was an assumption, Plaintiff provides very little independent evidence from which a reasonable juror could infer age discrimination as the "real" reason for her termination. *See Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 749 (4th Cir. 1999) ("[P]laintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for a discharge." (internal quotation marks omitted)).

9

Plaintiff cites statements by two Novant Health employees and an email from Novant Health's in-house counsel as evidence of pretext.[2] The first are statements by Melissa Lucas ("Lucas"), the individual whom Plaintiff claims was hired as her replacement. (ECF No. 43 at 15; ECF No. 42-1 ¶ 28.) According to Plaintiff, in April and May 2015 she spent considerable time with Lucas, at CAN, who stated on numerous occasions that "this isn't the way we do this anymore." (ECF No. 42-1 ¶ 28.) Plaintiff further stated that she was "aware that Ms. Lucas . . . is more than twenty years younger than [she]," and that Ms. Lucas "was very curt, negative or critical, and very condescending." (*Id.*) Other statements, evidencing pretext according to Plaintiff, were made by Marty Lambeth ("Lambeth") who Plaintiff identifies as "a manager of Novant [Health]." (*Id* ¶ 26.) According to Plaintiff, on or about March, 2015, Lambeth met with Plaintiff and introduced Lucas to her. (*Id.*) Lambeth then stated: "In the old days you and I would just sit down and discuss what was going on, what changes were needed, what concerns I had, but times have changed; now things no longer work that way." (*Id.*) At best these statements are ambiguous and make no reference to age; thus, such statements are not sufficient to create a triable issue of age discrimination. *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir. 1994) (holding that the statement that "there comes a time when we have to make way for younger people" is not sufficient to create an inference of age bias); *see also EEOC v. Clay Printing Co.*, 955 F.2d 936, 942 (4th Cir. 1992) (holding that statements about the need to "attract newer, younger people or "young blood" were insufficient evidence of age bias). While isolated statements can constitute evidence of

---

[2] In their Reply Brief, Defendants make three objections to this evidence tendered by Plaintiff based on attorney-client privilege, authentication, and hearsay. (ECF No. 44 at 12–13.) The Court has determined that those objections shall be overruled.

10

discrimination, such statements must be contemporaneous to the adverse employment action. *McCray v. Pee Dee Reg'l Transp. Auth.*, 263 F. App'x 301, 306 (4th Cir. 2008); *but see Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 234 (4th Cir. 2007) (finding evidence of discrimination when, during the conversation in which an employee was terminated, supervisor stated that he needed "younger, more aggressive Managers" and referring to another employee as "an F'n dinosaur" who was "next" to be terminated); *Gott v. Town of Chesapeake Beach, Md.*, 44 F. Supp. 3d 610, 615–16 (D. Md. 2014) (finding evidence of discrimination when employer told plaintiff during a meeting that the reason for not rehiring her was that the company was "just looking for younger people"). Further, the probativeness of such isolated statements "is circumscribed if they . . . were not related to the employment decision in question, or were made by nondecisionmakers." *Huang v. Gutierrez*, No. AW-08-2882, 2010 WL 93274, at *10 (D. Md. Jan. 5, 2010) (quoting *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001)). Here, Plaintiff does not contend that Ms. Lucas was a decisionmaker, nor does she contend that any of the statements were made in the context of her termination. Lastly, the email from Novant Health's in-house counsel stating "our story can simply be that we decided not to renew her contract," fails to provide support for Plaintiff's assumption that the real reason for her termination was discrimination based on age. (ECF No. 42-21 at 3.) The Court concludes that this evidence is insufficient to show pretext.

Plaintiff next argues that "following the termination, [D]efendants have engaged in inconsistent, unsupportable, *post hoc* efforts to justify the termination, clearly establishing pretext." (ECF No. 43 at 2.) According to Plaintiff, "three primary decisionmakers—David Duvall, Krista Tillman [("Tillman")], and Tim Clontz [("Clontz")]—all had different reasoning

11

and explanations for the decision [to terminate Plaintiff]." (*Id.* at 8.) A careful review of the deposition testimony of each of these individuals demonstrates that they each viewed Plaintiff's termination as a necessary outgrowth of Novant Health's decision to create a new consumer engagement center, internal to Novant Health and run by Novant Health employees, and to wind down CAN as proposed in the consultant's report.

As cited by Plaintiff, Duvall did state in his deposition that "we felt it was important that the leadership of the new entity be Novant Health so that they could help grow our culture, that they could infuse the culture, the service standards that we are known for into the organization." (ECF No. 42-8 at 16.) The statement was, however, a part of a greater discussion by Duvall:

> There was never a decision about Marty Norman, yay or nay. It was Call-A-Nurse [that] was going to be sunsetted, and a net new entity was going to be stood up. . . . It just was not at all logical to think that we would take a leader of this entity that we were going to sunset, which, by the way, was poorly performing, and make it part of a new entity. It just didn't enter into anyone's calculus.

(*Id.*)

Tillman's testimony is consistent with Duvall's testimony. She testified that she was hired by Novant Health as a consultant two months before Plaintiff was terminated; that she met with Plaintiff three or four times; and that she did not "make an independent assessment" of Plaintiff as an executive director. (ECF No. 42-6 at 14.) Tillman testified as follows: "The purpose of the assessment[ ] [I was hired to provide] was to try to decide if the implementation plan that Novant Health had when I started in March was a reasonable and feasible implementation plan to start a new engagement center." (*Id.*) Tillman further testified that

she "was asked not only to help stand up—implement the plan to stand up a new engagement center, but to also . . . improve and, hopefully, keep from declining any worse the service that was currently provided by Call-A-Nurse while the new engagement center was being stood up." (*Id.* at 19.) According to Tillman "[t]he management team, including Marty Norman, . . . was not helpful or supportive of being able to provide good service. So, the decision was made after our April report to move as quickly as possible to install a new management team to be able to provide better service." (*Id.*)

Plaintiff also states that Clontz, the Moses Cone representative who had served on the CAN board for eighteen years, (*see* ECF No. 42-5 at 7), was one of the decisionmakers who provided a different reason for her termination, (ECF No. 43 at 8). According to Plaintiff, Clontz stated that "the entirety of the motivation [for the decision to terminate Plaintiff] was that Norman had hired her son . . . and that Novant [Health] informed him that Norman was prioritizing third-party calls over those of Novant [Health] and [Moses] Cone." (*Id.*) While Clontz did state that those acts by Norman presented "a trust issue" for him, (ECF No. 42-5 at 34), Clontz also discussed the unsustainability of CAN based on Novant Health's decision to move in a new direction, (*id.* at 18–19), and he ultimately stated the following with respect to Plaintiff's termination:

> Typically, when you are closing a business, you have, essentially, two decisions you can make in terms of your lead administrative person in that. If you believe that they are in a position to be able to not only handle that gracefully, but do a great job of winding down the business, then you have that conversation. You create a severance packet that makes it very enticing for them to stay the entire length of the wind-down and then to find other employment. . . . On the other hand, if you believe that it is not in the best interest of the organization for the Executive Director to be a part of that wind-down, then you don't do it that

13

>     way. . . . I was concerned that it might not go well in terms of the
>     wind-down.

(*Id.* at 34.)

This evidence does not support Plaintiff's claim of pretext. Contrary to Plaintiff's argument that these individuals—Duvall, Tillman, and Clontz—gave inconsistent and shifting explanations for her termination, the reasons provided by each, when not selectively parsed, are consistent and support the legitimate nondiscriminatory reason proffered by Defendants for terminating Plaintiff during the transition period.

Plaintiff further argues that after her termination Novant Health continued to capture her deleted emails and that the finance director for Novant Health ran a credit card analysis of CAN which he then sent to the compliance department at Novant Health. (ECF No. 43 at 18–19.) According to Plaintiff, "[t]hose inquiries further underscore the pretextual nature of [her] ouster." (*Id.* at 19.) The evidence shows, however, that these actions were taken not only with respect to Plaintiff, but with respect to each of the CAN employees terminated on the same day as Plaintiff, irrespective whether they were over or under the age of 40. (*See* ECF 42-24 at 2; ECF No. 35-10 at 11.)

Moreover, as with all of the acts complained of by Plaintiff, which she argues demonstrate pretext, she has failed to present evidence demonstrating a nexus between these actions by Defendants and her claim that she is the victim of age discrimination. Plaintiff's failure to provide sufficient credible evidence of discriminatory animus related to age, from which a reasonable jury could find that she was terminated based on her age, is fatal to her claim. *See Mereish*, 359 F.3d at 336, 339. Accordingly, Plaintiff has failed to persuade this Court that she is the victim of discrimination based on age, nor has she raised a genuine issue of

material fact from which a jury could find in her favor. Defendants are entitled to summary judgement as a matter of law as to Plaintiff's ADEA claim.

## B. Wrongful Termination in Violation of North Carolina Public Policy

Defendants have likewise moved to dismiss Plaintiff's claim for wrongful termination in violation of N.C. Gen Stat § 143-422.2. (*See* ECF No. 35.) This claim is based on the same factual allegations as Plaintiff's ADEA claim and the Court must apply the same legal standards that apply under the ADEA claim. *Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 546 (M.D.N.C. 2002), *aff'd*, 58 F. App'x 47 (4th Cir. 2003). Consequently, having determined that there is no genuine issue of material fact with respect to the ADEA claim, and that Defendants are entitled to judgment on that claim as a matter of law, this Court concludes, for the reasons stated above related to her ADEA claim, that Plaintiff's state law claim for wrongful termination based on age discrimination must likewise fail. *See id.*

For the reasons outlined in the Memorandum above, the Court enters the following:

## ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 35), is GRANTED, and Plaintiff's Complaint is DISMISSED WITH PREJUDICE.

A Judgment dismissing this case will be entered contemporaneously with this Memorandum and Order.

This, the 4th day of December 2018.

/s/ Loretta C. Biggs
United States District Judge